NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200615-U

NO. 4-20-0615

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 29, 2022
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL D. MCCRAY, Defendant-Appellant. | ) Appeal from the<br>) Circuit Court of<br>) Champaign County<br>) No. 20CF402<br>)<br>) Honorable<br>) Randall B. Rosenbaum,<br>) Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Holder White and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) When all of the evidence is regarded in a light most favorable to the prosecution, a rational trier of fact could find, beyond a reasonable doubt, that some of the propositions essential to self-defense were, under the facts of this case, untrue.

(2) Any contention of error in the circuit court's granting of the State's motion *in limine* was procedurally forfeited because of the failure to make an offer of proof in the circuit court, and absent a clear or obvious error, the doctrine of plain error does not avert the forfeiture.

(3) Refraining from trying to impeach a state witness with a prior misdemeanor battery conviction fell within the wide range of reasonable professional assistance because it was questionable whether Illinois Rules of Evidence 404(b) and 405(b)(2) (eff. Jan. 1, 2011) allowed such use of the prior conviction.

(4) The sentence of eight years' imprisonment for the Class 1 felony of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2020)) is not an abuse of discretion.

¶ 2    In the circuit court of Champaign County, a jury rejected a claim of self-defense by

the defendant, Michael D. McCray, instead finding him guilty of the charged offense of aggravated

discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2020)). The court sentenced him to imprisonment for eight years. He appeals on four grounds.

¶ 3        First, the defendant argues that the State failed to prove, beyond a reasonable doubt, that he acted without legal justification—by which he means, specifically, the legal justification of self-defense. When we consider all of the trial evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could find, beyond a reasonable doubt, that some of the elements of self-defense were affirmatively negated by the evidence.

¶ 4        Second, the defendant argues that the circuit court erred by refusing to allow the defense to impeach a state witness with a misdemeanor battery conviction. We hold that this issue was procedurally forfeited by the defendant's failure to make an offer of proof in the circuit court. Also, finding no error that is clear or obvious, we hold that the doctrine of plain error does not avert the forfeiture.

¶ 5        Third, the defendant argues that defense counsel rendered ineffective assistance by failing to make the jury aware of the misdemeanor battery conviction in order to prove the witness's propensity for violence and thereby to make more credible the affirmative defense of self-defense. Because this case was not a homicide or battery case (see Ill. R. Evid. 405(b)(2) (eff. Jan. 1, 2011)), however, it was questionable whether Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011)) would have allowed such use of the prior conviction. Consequently, we find the strong presumption of reasonable professional assistance to be unrebutted.

¶ 6        Fourth, the defendant argues that imprisonment for eight years is excessive, considering that he had no prior convictions, he was educated and employed, and he had an excuse for his actions. The circuit court found, however—reasonably, in our view—that the defendant lacked an excuse for his actions, and the court took the mitigating factors into account by deciding

on a prison term that was seven years below the statutory maximum. We are unconvinced that this sentence is an abuse of discretion.

¶ 7        Therefore, we affirm the judgment.

¶ 8                  I. BACKGROUND

¶ 9              A. The State's Motion *in Limine*

¶ 10       After jury selection and before the trial began, the prosecutor made an oral motion *in limine* to bar the defense from impeaching one of the State's witnesses, Brylee Corbin, with a misdemeanor domestic battery conviction that she received in Champaign County case No. 20-CF-249. The circuit court asked defense counsel:

> "[D]o you have any intention of trying to impeach that witness with that misdemeanor conviction?
>
> [DEFENSE COUNSEL]: Your Honor, for impeachment, no. Possibly to motive or bias in regards to her coming into court on it. So if the State wants to address it on that basis?
>
> [THE PROSECUTOR]: Well, I—yes, I guess I would, Judge. I don't know what motive or bias counsel would be referring to.
>
> THE COURT: Well, unless I hear otherwise, there will be no mention of the prior conviction."

¶ 11                  B. The Jury Trial

¶ 12       The jury trial took place in September 2020. Evidence adduced in the trial tended to show the following.

¶ 13       In the late evening of April 17, 2020, and into the early morning of April 18, 2020, Brylee Corbin gave some guests a ride to her apartment in Champaign-Urbana, Illinois: Hannah

Richter, Savannah Truax, Devonte McCray, and his cousin, the defendant. There, in Corbin's apartment, they listened to music, and they danced. According to Corbin's testimony, there were no drugs at this party, nor was there any alcohol. Richter testified, however, that she had one mixed drink, and Truax testified that the defendant drank some liquor, too.

¶ 14 During the party, Corbin got into a disagreement with Devonte and the defendant. It was getting late, anyway—between 2 and 3 a.m.—and the women asked the two men to leave. Devonte and the defendant exited Corbin's apartment. The door of the apartment was locked behind them. Devonte left the area, but the defendant remained on the grounds of the apartment building. For about an hour, the defendant kept knocking at the door and windows of Corbin's apartment, begging to be let back in. Corbin refused to admit him.

¶ 15 Corbin testified that the defendant began "firing shots" behind her apartment—although, by her admission, she did not see him with a gun at that time and afterward she never noticed any shell casings outside her apartment. Richter likewise testified that she "heard a shot go off" outside Corbin's apartment and that the defendant then began screaming that someone was shooting at him. Truax testified that she, too, heard the defendant firing a gun outside Corbin's apartment (although, like Corbin, she admitted that she did not see him do so), and that after he fired the gun, he called out, " 'They're shooting at me. Let me in.' "

¶ 16 Finally, Corbin offered, through a window of her apartment, to give the defendant a ride to his apartment, which also was in Champaign-Urbana. He accepted this offer. They all got into Corbin's car: Corbin in the driver's seat, Richter in the front passenger seat, the defendant in the rear passenger seat behind Corbin, and Truax in the rear passenger seat behind Richter.

¶ 17 When they pulled into the parking lot of the apartment building in which the defendant resided, Richter and the defendant began arguing over a phone charger that was in the

- 4 -

car. Richter insisted that the charger belonged to her, whereas the defendant insisted that it belonged to him. Truax recalled growing nervous during this argument between the defendant and Richter because the defendant was "getting mad" and because, looking over at him sitting to the left of her, Truax noticed a pistol protruding from his right pocket. Richter ended the argument by taking the charger. As the defendant was getting out of the car, Truax testified, he "end[ed] up realizing that his charger [was] on the floorboard, *** beneath his feet."

¶ 18        The prosecutor showed Truax a photograph, People's exhibit No. 3a, which is in the record. This exhibit is a nighttime photograph of an asphalt parking lot illuminated by electric lights. In the background of the photograph, beyond a concrete curb, is what appears to be an apartment building. Two cars—a tan car on the viewer's left and a red car on the viewer's right—are parked between yellow lines painted on the asphalt, with their front tires against the curb and the rear of the cars facing the viewer. The two cars are separated by an empty parking place. Between the two cars, two red cones have been placed on the asphalt. One of the cones is beside a discarded plastic McDonald's cup, which, from the vantage of the viewer, is about a foot or two feet to the right of the left yellow line of the empty parking space (the parking space between the two cars). The cup lies at the end of that yellow line, at about where the parking space ends and the throughway of the parking lot begins. The other cone is beside an empty shell casing, which lies on the pavement about a couple of feet into the parking space of the tan car, near the right rear bumper of that car.

¶ 19        Truax testified that this photograph showed where they dropped the defendant off. She denied that they pulled into a parking spot. Rather, they remained on the throughway of the parking lot. Truax continued in her testimony:

"And then so he gets out of the car. And I don't know if he got mad at that because he realized, like—I don't know if he just, like, realized, like, he made a fool out of himself and then got mad and that's when he threw the water cup.

And then after he threw the water cup, like, [Corbin] was already, like, pulling off. And then so when he threw it, like, she backed up a little bit because she's like, like, 'What was that?' And then that's when I look back and I see him, like, aiming the gun. So I just get down like this (indicating), and then he just shoots."

¶ 20    The prosecutor asked Truax:

"Q. You said he gets out on his driver's side—

A. Mm-hmm.

Q. —through the passenger door and—

A. He goes around the back. Yeah.

Q. Throws the water cup?

A. Mm-hmm.

Q. And where does he go from there?

A. I think he goes, like, over by the sidewalk and, like, the grass area.

Q. Okay. Now, there's two cars in this photo. There's one that's sort of tan or gold-colored and one that's sort of red-colored. Which one, if either, do you remember him going over near?

A. By the red car.

Q. *** [T]here's a sidewalk and grass up to the right of that red car—

A. Mm-hmm. That's the area that he was standing in.

Q. Was he way off distant into the grass?

A. No. He was, like, a little on the sidewalk and in the grass.

Q. All right. And tell the juror [*sic*], he gets to that area, [Corbin's] backing the car—when she backs the car up, is she, like, aiming at him or anything like that?

A. No, not at all. Because at that point he's, like, already, like, not even behind her.

Q. So he's off to the side?

A. Yeah.

Q. She backs up and what happens?

* * *

A. After she backs up, then that's when he goes over there (pointing), and then he—that's when he shoots.

Q. Now, tell us, when you say, 'he shoots,' did you see him with the firearm?

A. Yes.

Q. And did it appear to be the same one you saw in his pocket?

A. Yes.

Q. And did you see him raise it up?

A. Yes. Because that's when I get down (indicating), like that, to protect myself."

Truax testified that she then heard a loud bang. Corbin sped away, and they stopped at a gas station. They called the police. Truax identified People's exhibit Nos. 3d and 3e as photographs of a bullet hole in the right rear passenger-side door of Corbin's four-door sedan: the door behind which

- 7 -

Truax had been sitting. These photographs likewise are in the record. The bullet hole is a puncture in the sheet metal surrounded by the round halo of an indentation. If the right rear passenger-side door were divided into four equal squares, the bullet hole would be in approximately the center of the bottom left square.

¶ 21          Corbin testified that as she was driving the defendant from her apartment to his apartment, the two of them quarreled because he wanted to return to her apartment and "hang out" but she did not want him to return to her apartment, for it was getting late—it was in the small hours of the morning—and she, Richter, and Truax were tired and "everybody was *** trying to go home." After it was established that the phone charger in the car belonged to Richter instead of to the defendant as he claimed, Corbin demanded that he get out of the car. They had arrived at his residence, and now they were waiting for him to get out so that they could be on their way. He refused to get out. Corbin threatened to call the police unless he exited her car. She continued in her testimony: "And I think that made him really mad, so when he got out of the car, he walked through the back of my car, threw a drink on my back windshield, and proceeded to walk into the grass."

¶ 22          "Tell us what happened next," the prosecutor said. Corbin answered:

"A. By the time he had gotten to the grass, I put my car in reverse, backed up, and rolled down the window and asked him why he just threw a drink at my car.

Q. Now, let's be candid. When you say, ''Why did you just throw a drink at my car,' did you say it just like that?

A. Yeah.

Q. Or did you—

- 8 -

A. Yes.

Q. Were you—were you upset also?

A. I mean, I wasn't upset to the point where I was trying to be disrespectful. I was just confused; you know what I mean? Because I wasn't expecting for him to throw a drink at my car.

Q. Okay. So you demand to know why he threw a drink at your car. How does he react? What does he do?

A. He starts shooting at my car.

Q. How far away was he?

A. Possibly like a hundred feet away from my car. I was still on the road in the apartments, but I was parked and he was already in the grass. So probably like a hundred feet, give or take."

¶ 23    The prosecutor asked Corbin if, at the time of the shooting, the defendant was farther away from her than the prosecutor was in the courtroom. She answered, "I don't believe so." The prosecutor requested that the record reflect that he was "still standing in the front area of the court, well in advance [*sic*] of a hundred feet towards the witness." The circuit court ordered that the record would "so reflect."

¶ 24    The prosecutor asked Corbin if she had to look over her right shoulder to see the defendant. She answered, "No. Because when he got out from behind me, he walked around to the back after he threw the drink at my car, so which puts him on the other side of the car. Which I can see him through the passenger window in the front seat." The prosecutor asked her:

"Q. Okay. So you're looking to your right from the seat, through and towards the passenger side?

A. Yes.

Q. And that's where he's at. He's out that way. And you said he was in the grass?

A. Yes."

¶ 25 According to Corbin's testimony, the defendant was standing in "that field in the right side of the red car," in the grass beyond the sidewalk, when she saw him raise his arm and shoot at her car. She had merely backed up on the same route by which she had arrived at the drop-off point. Then, when she attempted to question him through the rolled-down front passenger window, he fired at her car. She then took the car out of reverse, put it into drive, left the parking lot, and ended up at a gas station. The prosecutor asked Corbin:

"Q. You called the police along the way?

A. Yes."

¶ 26 Richter testified that, earlier that night, after the shot went off outside Corbin's apartment and the defendant screamed that someone was shooting at him, Corbin told him, " 'Okay. Where you want to go? I'll take you home. That way you can leave.' " He said he wanted to go to Country Brook Apartments. So, Corbin drove him there, with Richter in the front passenger seat, the defendant behind Corbin, and Truax behind Richter. Richter testified that the trip there was at first rather quiet. But then the defendant became "kind of upset because he really didn't want to go home." He "wanted to go back to [Corbin's] house and hang out more, but it was real early in the morning," and the women "were all ready to go to bed." As they pulled up to Country Brook Apartments, the defendant accused Richter of stealing his phone charger. When he "went to get out the car," however, "he end[ed] up finding his phone charger on the—on the [floorboard]," whereupon he "just easily got out of the car with no problem after that."

¶ 27        The prosecutor asked Richter:

"Q. When you guys pull into Country Brook, do you pull into a parking place to park? What do you do? What happens with you guys in the vehicle?

A. No. We just pulled in like—like, there's a road that you can drive down to go to other parts of Country Brook, and there's parking spaces on each side. We pulled up and stayed exactly in the road. We didn't park the car in any parking space at all.

Q. So it's basically dropping somebody off?

A. Yeah, yeah.

Q. So at this point, you're parked in that sort of roadway between the parking places?

A. Mm-hmm."

¶ 28        The defendant then got out of the backseat, Richter testified, walked around the back of the car, and threw a McDonald's cup at the car. Then he "end[ed] up *** on the curb, *** by the parking spaces." He was "standing toward[ ] the right side of [the] red car" that was parked where Corbin had dropped him off. He "was up on the sidewalk." Offended at having a cup thrown at her car by someone to whom she had just given a ride, Corbin backed up and asked the defendant, " 'Why did you throw that at my car?' " Richter continued: "I'm sitting there, I had my head down because, like I said, it's real early in the morning. I'm ready to go home and go to sleep. All of a sudden, we hear a gunshot. And [Corbin] just books it down the street. She's like, 'Oh, my gosh. He just shot at my car.' "

¶ 29        After the State finished its case in chief, the defendant took the stand in his own behalf and testified substantially as follows. Corbin and Richter picked up him and Devonte, and

the four of them "chilled" in Corbin's apartment for 10 or 15 minutes. Corbin then said she was going to Danville, Illinois, to pick up her friend Truax. The defendant and Devonte decided to ride along. On the interstate highway, Corbin, who was driving, "said she really couldn't see at night." Therefore, Corbin and Devonte "switched seats," and Devonte took over driving. At the defendant's request, they stopped at McDonald's, where he got some food and the McDonald's cup. They picked up Truax in Danville and headed back to Champaign-Urbana.

¶ 30 On the way back, everybody was drinking in Corbin's car. Not only that, but the defendant, Truax, and Richter "agreed to copulate with each other" in the backseat. As the three of them were "touching and kissing on each other," Devonte, who was driving, reached back and "started touching on [Truax]." Corbin, who was in the front passenger seat, became incensed when she saw Devonte touching Truax. Corbin told Devonte, " 'You not fitting to try to screw me and touch my friend at the same time.' " The two of them, Devonte and Corbin, argued with each other "the whole ride back."

¶ 31 Defense counsel asked the defendant, "What happened when you arrived [at Corbin's apartment]?" He answered:

> "[Richter] was intoxicated too much so she couldn't really walk, so me and [Truax] had carried [Richter] back into [Corbin's] apartment. And [Corbin] shut the door on Devonte, and she locked the door. And me and [Truax] had put [Richter] on the couch so she can just sit down and rest."

The defendant unlocked the door of Corbin's apartment so that Devonte could come in. When Devonte began arguing with Corbin again, the defendant "grabbed Devonte and took him outside so he [could] calm down." Devonte wanted to leave. The defendant "told him to calm down still, let me get my belongings out of her house, and we can leave."

¶ 32        Corbin, however, would not unlock the door so that the defendant could retrieve his belongings. He "kept knocking on the door and telling [Corbin] and them just to pass [him his] belongings." He denied firing a gun outside Corbin's apartment. Eventually, he walked back around the building to see if Devonte was still here, but Devonte was gone. The defendant testified:

> "[S]o I walked back around and told [Corbin] and them that my cousin left me and stuff like that and I needed by belongings. And she was like, 'We trying to sleep.' So I just say I just needed my belongings and, like, if you can give me a ride to where I need to go because it's too far for me to walk."

¶ 33        Corbin agreed to give the defendant a ride to his residence. The ride there was quiet. When they arrived at Country Brook Apartments, the defendant opened the car door and was about to get out when he remembered his phone charger, which he had put "in the front to charge up [his] phone when [they] first hopped in the car." Richter claimed that the charger belonged to her. The defendant disagreed. Instead of exiting the car, he closed the car door and said, " 'I'm not leaving until I get my belongings.' " Corbin threatened to call the police if he did not get out of the car. Eventually, Corbin gave him his charger, whereupon he "stepped out [of] the car" and "slammed the door."

¶ 34        Defense counsel asked the defendant:

> "Q. Okay. After you got out of the car, what did you do?
>
> A. I had walked behind the car and walked back towards the building, and I threw the cup at the car.
>
> Q. How far away from the car were you?
>
> A. Like, two or three steps away from the car.
>
> Q. Where—so you had gotten out on the rear driver's side door: correct?

A. Yes, sir.

Q. Where did you go after that? Before you threw the cup—where were you when you threw the cup?

A. I had walked behind the car and I was, like, in the direction going, like, towards the building, but I was still in the street.

Q. Okay. So you walked all the way around the car when you threw the cup?

A. No. I was still, like, behind the car still."

Q. At this point, what happened?

A. At this point, [Corbin] put her car in reverse and mashed the gas and swerved over towards me. And I took, like, two or three steps, and I turned around and discharged a firearm into her car in a justifiable manner.

Q. Let's—that's a lot to unpack. Let's go over that; okay? So after you threw the cup, you're walking away from the car?

A. Yes, sir.

Q. And you hear her revving her engine?

A. Yes, sir.

* * *

Q. Was this a different sound than what you had heard from the car all night?

A. Yes, sir.

Q. So at this point, what—the vehicle starts coming back towards you?

A. Yes, sir. The car swerved towards my direction.

Q. What do you mean by 'swerved'?

A. Like, she—you could see the car shift and, like, it turned towards my direction.

Q. Okay. Where are you at? Are you on the sidewalk, in the grass? Where are you at?

A. I'm still in the parking lot, like, in the street.

Q. Okay. Are you by any cars?

A. Like—yes, sir.

Q. Which cars?

A. A red car.

Q. And you say at this point, you step out of the way?

A. Yes, sir.

Q. Was the car still coming towards you?

A. Yes, sir.

Q. Did you perceive that this car was going to hit you?

A. Yes, sir. I felt like I was in danger.

Q. And you fired one shot?

A. Yes, sir. It was a warning shot.

Q. Where did you aim the shot?

A. Towards the ground.

Q. So not at the car?

A. No, sir."

¶ 35     On cross-examination, the prosecutor asked the defendant how close he was to Corbin's car when, as he had testified on direct examination, Corbin revved the engine, put the car

- 15 -

in reverse, jammed on the gas, and tried to run him over. The defendant answered that he "was like five, six feet away." The prosecutor asked him:

"Q. The car is moving fast?

A. It was not fast, fast, but she was going a nice little speed.

Q. She was going a nice little speed. What does that mean? Fast or not fast?

A. She wasn't going that fast.

Q. Now, you told counsel because he asked you, he said, 'Did you step out of the way?' And you said, 'Yes, sir.' Is—

A. Yes.

Q. Yeah. So you stepped out of the way of the car?

A. Yes, sir.

Q. So she was not going to hit you any more?

A. She had swerved towards me.

* * *

Q. [S]he swerved around the red car toward you?

A. No. She was still in the street.

* * *

Q. And where were you then?

A. I was still in the parking lot in the street.

Q. How close had you gotten up to this sidewalk, to the curb (pointing)?

A. I was pretty far from the sidewalk.

Q. Okay. Because you've seen where the shell casing is recovered; right? You—

A. Yes, sir.

Q. —saw the photos along with the jury?

A. Yes, sir.

Q. And you saw where the McDonald's cup was; didn't you? Saw the—

A. Yes, sir.

Q. —photos with the jury? And you saw how those were consistent with what the girls were saying about where the car was parked when they let you out; right?

A. Yes, sir.

Q. All right. But now you're saying that the car backed up and swerved toward you. Counsel said, 'Did you step out of the way?' And you said, 'Yes, sir.' And then he asked you, 'But also the car was going to hit you?' And you said, again, 'Yes, sir.'

So you stepped out of the way and the car was going to hit you?

A. She was coming towards my way.

Q. Okay. And so she was coming directly at you?

A. Yes, sir.

Q. She was going—so we're as close as here (pointing) at the back of the car—and we're talking about the front of the car or the back of the car?

A. The back of the car.

* * *

Q. All right. So you had to reach into that pocket while the car is speeding— moving at a good bit of speed toward you from five to six feet away. While that car

is coming, you got to get your hand into the pocket, pull it out, point it down at the ground, pull the trigger. And you thought that was going to stop the speeding car from hitting you?

A. I mean, if she would have heard the shot, she would have stopped.

\* \* \*

Q. \*\*\* The back of the car is coming straight at you from about five to six feet away at a good bit of speed when you decide to fire the gun at the ground; is that right?

A. No, sir. Because I had stepped out of the way.

Q. Oh, I'm sorry. So you did get out of the way? Was the car going to hit you or not?

A. When it was coming towards me, I had got out of the way and I took two or three steps and I discharged my firearm.

\* \* \*

Q. You were already out of the way of the car, you were out of danger at the time you fired your gun; is that what you're telling us now?

A. I mean, she was still backing up towards me.

Q. I thought you just said you stepped out of the way?

A. Right."

¶ 36                    C. The Jury Instructions on Self-Defense

¶ 37        At first, the State opposed the giving of self-defense instructions to the jury. The circuit court was disinclined to give such instructions. The court was unconvinced that any evidence had been presented to support a jury instruction on self-defense. Addressing defense

counsel, the court reasoned as follows: "[B]ased upon your client's testimony, he didn't shoot at the car. He fired a round into the ground. I'm not sure self-defense, based upon all the evidence at this point, is even a little issue for the jury." Nevertheless, the court resolved that if, during its deliberations, the jury sent out a question about self-defense, the court would provide the jury the self-defense instructions that defense counsel had tendered.

¶ 38      After a lunch break, however, the prosecutor told the circuit court that he had changed his mind about jury instructions on self-defense. He was "loath to invite the Appellate Court to reverse what could be a good conviction if they were to disagree with the way things roll out." Instead of running that risk, the prosecutor acceded to instructing the jury on self-defense.

¶ 39      Without objection by either of the parties, the circuit court instructed the jury:

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.

However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself."

Also, the court instructed the jury that "[t]o sustain the charge of aggravated discharge of a firearm," one of the propositions that the State had to prove, beyond a reasonable doubt, was "[t]hat the Defendant was not justified in using the force which he used."

¶ 40                    D. The Guilty Verdict and the Posttrial Motion

¶ 41      On September 17, 2020, the jury found the defendant guilty of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2020)).

¶ 42        On October 7, 2020, the defense filed a "Motion For Acquittals or in the Alternative Motion For a New Trial." One of the claims in this posttrial motion was that the circuit court had "erred in granting the Defense's [*sic*] oral Motion in Limine to exclude any impeachment about the eyewitness's priors."

¶ 43        On October 19, 2020, the circuit court denied the posttrial motion.

¶ 44                                E. The Sentence

¶ 45        On October 19, 2020, immediately after denying the posttrial motion, the circuit court held a sentencing hearing.

¶ 46        In the sentencing hearing, the defense called the defendant's grandmother, Beatrice Lindsey. She testified that the defendant had always been helpful and obedient to his mother, who had diabetes, was suffering from kidney failure, and was on dialysis. Lindsey described the defendant as having been "a very good child" who had never gotten into serious trouble. Defense counsel asked Lindsey to describe the defendant's relationship to his children. (The presentence investigation report revealed that the defendant, who was single, had two children, aged four years old and five months old, both of whom resided with their mothers.) Lindsey answered, "I say very good, you know. He did little odds and end jobs. You know, whenever he did work, he give her money, you know, the mother, you know, to get pampers, milk and stuff like that, so." She thought that the defendant "love[d] his kids very much."

¶ 47        On cross-examination by the prosecutor, Lindsey testified that although she was "very close to" the defendant, she had no idea where he had obtained the pistol and she "didn't know what was going on with him at the time he was running around with a firearm." The prosecutor asked her:

"Q. You're aware that he indicates that he's been constantly taking pills to get high until the age of 24? He's 25 now.

A. No.

Q. That he admitted that he was under the influence of drugs when he committed this offense?

A. No, I didn't know that."

¶ 48 The presentence investigation report reads that "[t]he Defendant presents a history of drug and alcohol abuse," but the report does not appear to offer any details. In the sentencing hearing, however, defense counsel remarked, "Your Honor. I would note that there's substance abuse issues, that his use of cannabis daily, ecstasy pills. He notes he was under the influence of alcohol and drugs during this current offense." The presentence report reveals that the defendant "was referred to complete a substance abuse evaluation as a juvenile" but that he "did not comply with said referral." The report adds that, "[a]s an adult, the Defendant has not participated in any type of substance abuse treatment or counseling."

¶ 49 The defendant made a statement in allocution. He assured the circuit court that he was "not a repeated criminal nor a terrible person" but that he was, instead, "a young adult that just made a stupid decision in which no harm was ever caused here." He said that he was "very sorry for the committed conduct, and for whatever emotional harm that [he] may have caused all victims in this case." He requested the court to take into account his youth, his lack of a criminal history, his gainful employment, his children, and his ailing mother.

¶ 50 The circuit court explicitly considered, as a mitigating factor, the defendant's lack of a prior criminal history, noting that he had only a juvenile adjudication. The court further found:

"There is other mitigation in this record. It may not necessarily be statutory mitigation, but there is mitigation. He's only 25 years of age. He's gotten his high school diploma or GED, and he has gotten some college. He has been able to be employed. These are all nonstatutory mitigating factors."

¶ 51 The only statutory aggravating factor that the circuit court found was the need to deter other young men like the defendant who saw fit to arm themselves with a pistol and who, in a fit of bad temper, might misuse the pistol and endanger others. The court remarked:

"And in this case, these three young women had absolutely posed no threat to [the defendant]. He was upset with them for that evening. It was obvious. And he culminated the evening by firing a round at their car. Fortunately, no one was struck by the projectile. And [the defendant] now sits here, as I've indicated, with little or no prior criminal history, and arming himself with a firearm, getting upset, and using it.

So the deterrent factor is one that the Court has to consider, and over the course of many years has considered over and over again for young men who arm themselves with firearms and then ultimately use that firearm."

¶ 52 A community-based sentence, the circuit court decided, would "deprecate the seriousness of [the defendant's] conduct," "would be inconsistent with the ends of justice," and would fail to have the desired deterrent effect. Therefore, the court imposed a sentence of imprisonment for eight years.

¶ 53 On November 12, 2020, the defense moved for a reduction of the sentence.

¶ 54 On December 4, 2020, the circuit court denied the motion.

¶ 55 Immediately afterward, on that same day, a notice of appeal was filed.

¶ 56                                    II. ANALYSIS

¶ 57                                    A. Self-Defense

¶ 58           The defendant's first contention is that the State failed to negate, beyond a

reasonable doubt, his affirmative defense of self-defense.

¶ 59           The circuit court instructed the jury on the principles of self-defense set forth in

section 7-1(a) of the Criminal Code of 2012 (720 ILCS 5/7-1(a) (West 2020)), which provided as

follows:

> "A person is justified in the use of force against another when and to the extent that
>
> he reasonably believes that such conduct is necessary to defend himself or another
>
> against such other's imminent use of unlawful force. However, he is justified in the
>
> use of force which is intended or likely to cause death or great bodily harm only if
>
> he reasonably believes that such force is necessary to prevent imminent death or
>
> great bodily harm to himself or another, or the commission of a forcible felony."

Section 7-1(a) can be broken down into six elements:

> "(1) force is threatened against a person, (2) the person is not the aggressor, (3) the
>
> danger of harm was imminent, (4) the threatened force was unlawful, (5) the person
>
> actually and subjectively believed a danger existed that required the use of the force
>
> applied, and (6) the person's beliefs were objectively reasonable." *People v.*
>
> *Washington*, 2012 IL 110283, ¶ 35.

¶ 60           If, in the trial, "some evidence" supporting each of those six elements of

self-defense is presented (*People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995)), the State has the

burden of proving, beyond a reasonable doubt, not only the elements of the charged offense but

also the falsity of at least one of those six elements of self-defense (see *People v. Lee*, 213 Ill. 2d 218, 224-25 (2004)).

¶ 61     When, on appeal, the defendant contends that the State failed to carry its burden of negating at least one of elements of self-defense, our standard of review is deferential. "The standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that the defendant did not act in self-defense." *People v. Gray*, 2017 IL 120958, ¶ 51. The defendant argues that, even when all of the evidence is viewed in a light most favorable to the prosecution (as the evidence must be viewed on appeal), it would be impossible for any rational trier of fact to find any of the six elements of self-defense to be negated beyond a reasonable doubt.

¶ 62     Let us begin with the first element of self-defense: that force was threatened against the defendant. See *Washington*, 2012 IL 110283, ¶ 35. When we view all of the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could find, beyond a reasonable doubt, that no force was threatened against the defendant. The jury did not have to believe the defendant when he testified that Corbin tried to back her car over him. The jury was free to believe, instead, Corbin's testimony that by the time she backed up her car to question the defendant, he had walked out of the throughway and was "on the other side of [her] car," out of danger. The jury could have found Corbin's testimony to be supported by the testimony of her other passengers that the defendant was out of the way when Corbin backed up. After all, that the defendant had walked out of the throughway and had begun heading toward his apartment when Corbin stopped her car, put it in reverse, and backed up is not inherently incredible. "[A] court of review will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses." See *Gray*, 2017 IL 120958, ¶ 35.

¶ 63        Other elements of self-defense are that when the defendant fired his pistol, he believed that the "the danger of harm" to him "was imminent" and his belief was "objectively reasonable." *Washington*, 2012 IL 110283, ¶ 35. "In the context of self-defense, imminent means reasonably probable, not merely possible [citation], and refers not to a future threat but to one that is present [citation] or immediate [citation]." (Internal quotation marks omitted.) *People v. Robinson*, 375 Ill. App. 3d 320, 336 (2007). Merely from the location of the bullet hole—in the rear passenger-side door of Corbin's car—the jury was entitled to find, beyond a reasonable doubt, that the defendant was in no danger of harm when he fired his pistol and that if he believed he was in imminent danger of harm, his belief was objectively unreasonable. To have inflicted that bullet hole, the defendant would have had to be standing to the side of the car, not behind it. Obviously, the car was incapable of travelling sideways, at a right angle, and hitting him. In cross-examination by the prosecutor, the defendant struggled to adequately explain how he was in danger of being run over if, according to his own testimony, he had stepped out of the way as the car was backing up. Arguably, the location of the fallen shell casing—by the right rear bumper of the parked tan car—tends to suggest that he was safely out of the throughway and among the parking spaces when he shot the side of Corbin's car. Finally, the testimony by Corbin, Richter, and Truax that, earlier, the defendant had resorted to the ruse of firing his pistol outside Corbin's apartment in an effort to gain admission could have weakened the jury's confidence not only in his credibility but in his responsibility as a possessor of a firearm.

¶ 64        In short, then, when we view all of the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could find, beyond a reasonable doubt, that the defendant did not act in self-defense. See *Gray*, 2017 IL 120958, ¶ 51.

¶ 65              B. The Granting of the State's Motion *in Limine*

¶ 66　　　　The defendant argues that the circuit court erred by granting the State's pretrial motion *in limine* to bar the defense from impeaching Corbin with her prior conviction of misdemeanor battery. To support that argument, the defendant requests that we take judicial notice of information on the Champaign County circuit clerk's website, which shows that when Corbin first identified the defendant as the individual who had shot her car, she had pending against her a charge of aggravated battery by the use of a deadly weapon. See *Wells Fargo Bank, N.A. v. Simpson*, 2015 IL App (1st) 142925, ¶ 24 n.4 (taking "judicial notice of the online docket report of probate division filings issued by the clerk of the circuit court of Cook County"). On May 28, 2020, according to the website, this charge was dismissed, and Corbin pleaded guilty to a lesser charge of domestic battery with the infliction of bodily harm, an offense for which she was sentenced to 12 months' probation. Thus, when testifying against the defendant, Corbin was on probation. Consequently, the defendant argues, quoting *Davis v. Alaska*, 415 U.S. 308, 317-18 (1974), Corbin "had a potential bias to testify falsely to support the State's case due to her 'vulnerable status as a probationer.' " Also, the defendant quotes *People v. Prevo*, 302 Ill. App. 3d 1038, 1047 (1999): a "defendant states a violation of the Confrontation Clause [(U.S. Const., amend. VI)] by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias and thereby exposing the [fact-finder] to facts from which it could reasonably draw inferences about the witness'[s] reliability." (Internal quotation marks omitted.)

¶ 67　　　　The State counters that because of the defendant's failure to make an offer of proof in the circuit court, he has forfeited this confrontation-clause argument. See Ill. R. Evid. 103(a)(2) (eff. Oct. 15, 2015). "It is well settled that the key to preserving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court and [that] a defendant's failure to make

such an offer results in a forfeiture of the issue." *People v. Staake*, 2017 IL 121755, ¶ 51. Making an offer of proof to us alone will not suffice. Part of the purpose of an offer of proof is to enable opposing counsel to make an informed objection in the circuit court and to enable the circuit court to make an informed ruling. *Cundiff v. Patel*, 2012 IL App (4th) 120031, ¶ 20. Depriving them of that benefit works a forfeiture. See Ill. R. Evid. 103(a)(2) (eff. Oct. 15, 2015). In his reply brief, the defendant seeks to avert the forfeiture by invoking the doctrine of plain error, claiming that the evidence in the jury trial was closely balanced. See Ill. R. Evid. 103(e) (eff. Oct. 15, 2015); *People v. Sebby*, 2017 IL 119445, ¶ 48.

¶ 68        The first question in plain-error review is whether "a clear or obvious error occurred." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). If the exclusion of Corbin's domestic-battery conviction was an error, the error was less than clear or obvious. Arguably, the present case is distinguishable from *Davis* in that, unlike the defendant in *Davis*, the defendant in the present case did not have to bring out the prior conviction to show the witness's possible bias.

¶ 69        In *Davis*, a bar was burglarized, and a safe stolen. *Davis*, 415 U.S. at 309. Later, in the afternoon, the safe was found near the home of Jess Straight and his family. *Id.* The safe had been pried open and emptied of its contents. *Id.* Straight's stepson, 16-year-old Richard Green, told the police at the scene that, earlier in the day, around noon, he spoke with two men who were standing by a blue car that was parked where the safe later was discovered. *Id.* After giving this account, Green went to the police station and, out of a group of photographs, selected the photograph of Joshaway Davis. *Id.* at 309-10. Later, Green identified Davis in a lineup. *Id.* at 310. The state charged Davis with burglary and grand larceny. *Id.* at 320-21. In the trial, the defense wanted to suggest to the jury that Green had falsely implicated Davis in order to throw suspicion off himself. *Id.* at 311. To that end, on cross-examination, defense counsel asked Green, in several

different ways, if he had been concerned that the police would suspect him of having burglarized the bar. *Id.* at 313-14. Green steadfastly denied ever having such a concern. *Id.* He even denied that he had " 'ever been questioned like that before by any law enforcement officers.' " *Id.* at 313. Defense counsel was virtually helpless against those denials, for in a pretrial hearing, the trial court had entered a protective order barring defense counsel from revealing to the jury that, at the time Green identified Davis, Green was on probation for burglarizing two cabins. *Id.* at 311. Consequently, the jury "might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness." *Id.* at 318.

¶ 70        The protective order, the Supreme Court held, violated Davis's right under the confrontation clause to explore, by cross-examination, the possibility that bias had motivated Green's initial identification of Davis and his later testimony against Davis. *Id.* at 319. "The claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of Green's vulnerable status as a probationer [citation], as well as of Green's possible concern that he might be a suspect in the investigation." *Id.* at 317-18. The State's "interest in protecting the confidentiality of a juvenile offender's record" had to yield to "so vital a constitutional right as the effective cross-examination for bias of an adverse witness." *Id.* at 320.

¶ 71        *Davis* is distinguishable because the connection between Corbin's probationary status and her possible bias is more tenuous. In *Davis*, the defense would have had a reasonable argument that the mere discovery of the safe near Green's house and the stepfather's calling of the police (see *Davis v. State of Alaska*, 499 P.2d 1025, 1027 (Alaska 1972)) had put pressure on Green to falsely identify Davis out of fear that, given Green's juvenile record, the police otherwise would have suspected Green of stealing the safe. In the present case, by contrast, the defense would not have had a reasonable argument that the bullet hole in the right rear passenger-side door of

Corbin's car had put pressure on Corbin to falsely implicate the defendant in order to deflect suspicion from herself. It is unclear how she could have perceived herself to be under suspicion. The mere fact that she had a bullet hole in the side of her car could not have raised a suspicion that she had tried to run someone over or that she had committed any other criminal offense. In other words, the bullet hole in Corbin's car is not fairly comparable to the stolen safe discovered near the home of a juvenile on probation for burglary. Corbin would not have rationally felt her probation to be endangered by the bullet hole in her car, whereas Green, a juvenile, might have felt his probation to be endangered by the discovery of the safe near his home. To drive home this contrast, Green reacted to the arrival of the police, whereas Corbin called the police. Corbin's own act of calling the police seems inconsistent with a fear that the police would suspect her.

¶ 72        Granted, in her testimony in the trial, Corbin had an incentive to dispel any impression that she had tried to run the defendant over. Her being on probation, however, was marginal to that incentive. Probation or no probation, the commission of aggravated assault or attempted murder would have exposed her, like anyone else, to criminal liability. The defense did not need to bring out her status as a probationer to argue the already-obvious incentive she had to testify that the defendant was out of the way when she backed up her car. Therefore, we find no clear or obvious violation of the confrontation clause, and the forfeiture of this issue will be honored. See *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 73                    C. The Claim of Ineffective Assistance

¶ 74        The defendant claims that his trial counsel rendered ineffective assistance by failing to present, as evidence of Corbin's propensity for violence, her prior conviction of domestic battery. On the authority of *People v. Lynch*, 104 Ill. 2d 194 (1984), and *People v. Simon*, 2011 IL App (1st) 091197, the defendant argues that "[w]hen a defendant raises the issue of self-defense,

he or she can introduce character evidence or violent acts by the alleged victim, either to show the defendant's state of mind if he was aware of the acts or to show that the victim in fact had been the aggressor, even if the defendant was not aware of the acts." The defendant does not claim that, at the time he shot Corbin's car, he was aware that Corbin had a prior conviction of domestic battery. Even so, he regards the prior conviction as relevant to prove Corbin's propensity to commit acts of violence, and he faults his defense counsel for omitting to present the prior conviction for that purpose.

¶ 75   We see two problems with this claim of ineffective assistance.

¶ 76   First, in its pretrial ruling on the State's motion *in limine*, the circuit court ordered, "[U]nless I hear otherwise, there will be no mention of the prior conviction." Defense counsel could not adduce evidence of Corbin's prior conviction. By court order, he was forbidden to do so.

¶ 77   Second, *Lynch* and *Simon* were murder cases. See *Lynch*, 104 Ill. 2d at 197; *Simon*, 2011 IL App (1st) 091197, ¶ 1. The present case is not a murder case. Rather, the defendant was charged with aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2020)). The defendant might rejoin that, nevertheless, the discussion in *Lynch*, 104 Ill. 2d at 200-01, and *Simon*, 2011 IL App (1st) 091197, ¶ 70, regarding the admissibility of propensity evidence to support a claim of self-defense is logically relevant to any case in which such a claim is made.

¶ 78   But the Illinois Rules of Evidence do not appear to take that view. Rule 404(b) lays down a general prohibition: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith except as provided by" various statutory provisions that are irrelevant here. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Rule 405(b)(2) carves out a further exception to the general ban on propensity evidence: "*In criminal*

*homicide or battery cases* when the accused raises the theory of self-defense and there is conflicting evidence as to whether the alleged victim was the aggressor, proof may also be made of specific instances of the alleged victim's prior violent conduct." (Emphasis added.) Ill. R. Evid. 405(b)(2) (eff. Jan. 1, 2011). Supreme court rules are to be interpreted in the same manner as statutes. *In re Estate of Rennick*, 181 Ill. 2d 395, 404 (1998). "Under the maxim of *expressio unius est exclusio alterius*, the enumeration of an exception in a statute is considered to be an exclusion of all other exceptions." *Schultz v. Performance Lighting, Inc.*, 2013 IL 115738, ¶ 17. Rule 405(b)(2) is intended as an exception to Rule 404(b), as the comment to Rule 405(b)(2) implies:

> "Specific instances of a person's conduct as proof of a person's character or trait of character are not generally admissible as proof that the person acted in conformity therewith. *** Specific instances of conduct are *** admissible under Rule 405(b)(2) in criminal homicide or battery cases when the accused raises the theory of self-defense and there is conflicting evidence as to whether the alleged victim was the aggressor." Ill. R. Evid. 405, Committee Comments (eff. Jan. 1, 2011).

A reasonable defense counsel could have assumed that because a case of aggravated discharge of a weapon was not a "criminal homicide or battery case[ ]" (Ill. R. Evid. 405(b)(2) (eff. Jan. 1, 2011)), Corbin's prior conviction of domestic battery was "not admissible to prove [her] character *** in order to show action in conformity therewith" (Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)).

¶ 79          In sum, then, because the defendant has failed to rebut the " 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance,' " we

find no merit in his claim of ineffective assistance. *People v. Peeples*, 205 Ill. 2d 480, 540 (2002) (*quoting Strickland v. Washington*, 466 U.S. 668, 689 (1984)).

¶ 80                                    D. The Severity of the Sentence

¶ 81          The offense of which the defendant was convicted, aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2020)), was a Class 1 felony (*id.* § 24-1.2(b)), which was punishable by imprisonment for not less than 4 years and not more than 15 years (730 ILCS 5/5-4.5-30(a) (West 2020)). The circuit court sentenced him to eight years' imprisonment, which was four years above the minimum and seven years below the maximum. So, it was sentence somewhat toward the lower end of the statutory range.

¶ 82          In determining this sentence, the circuit court explicitly took into consideration, as mitigating factors, the defendant's lack of a criminal history (other than a juvenile adjudication for theft), his young age of 25 years, his education, and his employment. Even so, the defendant contends that the court "failed to adequately consider the substantial mitigation present in this case." His expression of remorse, he argues, was "another significant mitigating factor" that should have pushed the sentence even lower. Also, he maintains that "there were substantial grounds tending to excuse or justify [his] criminal conduct, though failing to establish a defense." 730 ILCS 5/5-5-3.1(a)(4) (West 2020).

¶ 83          By "substantial grounds," the defendant refers to the affirmative defense of self-defense that he raised in the jury trial. To be sure, he had the right to take the stand and claim self-defense. Making such a claim, however, could carry a risk. If, given the circumstances of the offense, the claim of self-defense seems to be one that could not honestly be made—if it seems implausible that the defendant really believed, at the time, that the use of unlawful force against him was imminent—he could come across as cynically trying to shift responsibility from himself

- 32 -

to his victim. As a result, later on, in the sentencing hearing, the defendant's expression of remorse could be perceived as more tactical than sincere.

¶ 84        Arguably, when standing to the side of Corbin's car—which is where the defendant had to be standing to shoot the passenger-side door—he did not really believe, at that moment, that he was in imminent danger of having the car backed over him. He represented, under oath, that after stepping aside, he still believed he had to defend himself against an imminent threat of bodily harm. It might be reasonably inferred, however, that when he shot the passenger-side door behind which Truax sat, he lacked such a belief, for he no longer was in the car's path and, without being repositioned, the car could not have struck him where he then stood. In the sentencing hearing, the circuit court pointedly took note of what it perceived as the spuriousness of the defendant's claim of self-defense. The court said, "[T]hese three young women had absolutely posed no threat to [the defendant]. He was upset with them for that evening. It was obvious. And he culminated the evening by firing a round at their car." False testimony—especially testimony that falsely blames a victim of one's own violence—is relevant to "general moral character," which, as the defendant argues, the sentencing court "must carefully consider." (Internal quotation marks omitted.) *People v. Wyma*, 2020 IL App (1st) 170786, ¶ 93.

¶ 85        According to the defendant, his "personal background indicate[d] that he possesse[d] the capability and potential for rehabilitation," and the circuit court was required to "consider that background as a strong mitigating factor." *People v. Center*, 198 Ill. App. 3d 1025, 1035 (1990). One hopes that the defendant will be rehabilitated, but not everything in his background shows a strong potential for rehabilitation. Granted, he has completed high school, has taken some college courses, and has been employed. On the other side of the ledger, however, he has longstanding "substance abuse issues," as defense counsel put it, and he "was under the

influence of alcohol and drugs during this current offense." Also, the presentence report notes that the defendant "was referred to complete a substance abuse evaluation as a juvenile" but that he "did not comply with said referral." Attributing the noncompliance to teenage immaturity would be problematic considering that, likewise, "[a]s an adult, the Defendant has not participated in any type of substance abuse treatment or counseling."

¶ 86 When we consider the untreated drug and alcohol problem, the need for deterrence, and the flimsiness of the defendant's claim of self-defense, we are unable to say that sentencing the defendant to a term of imprisonment that exceeded the minimum by only four years was an abuse of discretion. See *People v. Lawson*, 2018 IL App (4th) 170105, ¶ 28. "An abuse of discretion will not be found unless the court's sentencing decision is fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *Id.* We are unconvinced that all reasonable persons would regard the mitigating factors as slighted by this sentence that is closer to the lower end of the statutory range than the higher end.

¶ 87                                     III. CONCLUSION

¶ 88          For the foregoing reasons, we affirm the circuit court's judgment.

¶ 89          Affirmed.